Filed 2/24/15  P. v. Hernandez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDWARD GIOVANI HERNANDEZ,<br>et al.,<br><br>    Defendants and Appellants. | B240884<br><br>(Los Angeles County<br>Super. Ct. No. BA348445) |

        APPEAL from judgments of the Superior Court of Los Angeles County. Larry P. Fidler, Judge.  Affirmed.

        John Lanahan, under appointment by the Court of Appeal, for Defendant and Appellant Edward Giovani Hernandez.

        Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Boris Alexander Bonilla.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Yun K. Lee, Eric E. Reynolds, and Mark E. Weber, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendants and appellants Edward Giovani Hernandez and Boris Alexander Bonilla[1] were each convicted of first degree murder and attempted extortion, with gang enhancements as to both crimes and gun enhancements as to the first degree murder charges. The trial court instructed the jury on, among other things, aider and abettor liability for first degree premeditated murder under a natural and probable consequences theory. After this appeal was filed and fully briefed, the California Supreme Court decided *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), in which the court held that a first degree premeditated murder cannot be a natural and probable consequence of a target offense. In light of *Chiu*, defendants argue their convictions for first degree murder must be reversed because the trial court erred in instructing the jury that the natural and probable consequences doctrine served as a proper basis for a first degree murder conviction. Although we agree the trial court erred in instructing on the natural and probable consequences doctrine, we conclude such error was harmless. After addressing defendants' other contentions raised on appeal, we affirm the trial court's judgments as to both Hernandez and Bonilla.

## FACTUAL BACKGROUND

This case involves the killing of a gang member at a casita that was being extorted by members of the victim's rival gang.[2]

*1. The Casita, the Payment Arrangement, and the Shooting*

Literally meaning "little house" in Spanish, a casita is an illegal establishment that typically sells alcohol and drugs, while providing an after-hours venue for, among other things, drinking, gambling, drug use, and prostitution. Casitas usually operate out of apartments, houses, or abandoned businesses, and they are often located in gang territories. Upon discovering a casita's establishment in its territory, the territory's

---

[1]     Sometimes collectively referred to as defendants.

[2]     We summarize the evidence in a light favoring the judgment. (*People v. Barnes* (1986) 42 Cal.3d 284, 303-304.)

controlling gang will usually approach the casita's owners and demand payment in exchange for the gang's protection from other local gangs.  Any payment is typically drawn as a percentage of the casita's proceeds.  Generally, casita owners comply with the controlling gang's demands for payment because they often perceive the gang's demands as threats.

Once a gang establishes control over a casita, it does not always exclude rival gang members from the casita; the controlling gang will often permit rival gang members to partake in the casita's services so long as those individuals do not disturb, or attempt to take over, the casita's operations.  The controlling gang will often install in the casita its own members to serve as security, and to ensure the casita's owners are paying the gang the correct amount of money.  Generally, the gang members providing security are not concerned with the safety of the casita's patrons; rather, they are only concerned with protecting their gang's interest in the casita's revenue.  To preserve their gang's interest in the casita's revenue, gang members providing security will often use violence to remove, or sometimes kill, individuals that disturb or threaten the casita's operations.

Around September 10, 2008, Evelyn Valdez and Jimmy Palacios, a couple from Guatemala, opened a casita at their apartment located at 3002 James M. Woods Boulevard in Los Angeles.  Valdez and Palacios advertised their casita by dropping small, business-card sized advertisements at bars located throughout the local neighborhood, including Barra Latina, where Hernandez worked as a manager.

Within a few days of opening their casita, Valdez and Palacios received a phone call on Palacios's phone while they were working at the casita.  The call came from Valdez's sister, who was calling from Valdez's phone.  According to Valdez's sister, a man had called Valdez's phone demanding to speak to Valdez.  The man said: "I'm Cesar.  Could you tell [Valdez] that I'm outside [the casita].  I'm out front on some motorcycles, and if she doesn't come out, I'm going to beat down the doors."

After Valdez spoke with her sister, she and Palacios went outside to speak with Cesar.  Although she was scared of Cesar, Valdez believed she had no other choice but to meet with him because he had threatened to break down the casita's doors.  When they

3

went outside, Valdez and Palacios saw a group of men standing near three or four motorcycles. Valdez approached the group alone. She was then directed to speak to Cesar, who she and Palacios later identified as Hernandez.

When Valdez introduced herself to Hernandez, he confirmed he was the man who spoke to Valdez's sister earlier that night. Hernandez then told Valdez she needed to pay him between $350 to $450 per month so that he could protect the casita from some "cholos" in the neighborhood. Hernandez told Valdez that the cholos were like children and would not mind killing people for money. He said the cholos would not harm anyone if they knew he was in charge of the casita. Valdez told Hernandez she needed to speak with Palacios before agreeing to make any payments. She told Hernandez she would call him when she was ready to discuss a potential arrangement.

The next day, while she was at a restaurant with Palacios and her sister, Valdez saw Hernandez getting into a burgundy truck with doors that opened vertically. Scared that he had followed her to the restaurant, Valdez called Hernandez to tell him she wanted to meet to discuss a payment arrangement.

Later that night, Valdez and Palacios met with Hernandez at the casita. Hernandez first spoke with Palacios alone while Valdez tended to the casita. He told Palacios he wanted to collect rent from the casita and, in exchange for the payments, he would provide protection for Valdez and Palacios. He told Palacios he hoped they could reach an agreement because he did not want any trouble. Hernandez then proposed the rent be set at $350 per month.

When Valdez returned, Hernandez asked her if she and Palacios sold cocaine inside the casita. When Valdez replied they did not, Hernandez said he would send someone to the casita to sell drugs. Hernandez told Valdez and Palacios he would lower their payments to $250 per month if they gave him exclusive control over drug sales inside the casita. Valdez and Palacios did not want anyone to sell drugs inside the casita; however, they agreed to Hernandez's arrangement because they were too afraid to tell him no. Hernandez then told Valdez and Palacios he would send some people to the casita to sell drugs and provide security.

4

The next night, Hernandez returned to the casita with a man named Willie. Hernandez introduced Willie to Valdez as the person who would be selling drugs inside the casita.

Several nights later, Hernandez and Bonilla arrived at the casita in a small white car. Hernandez introduced Bonilla to Valdez and Palacios as his brother. Hernandez told Valdez that Bonilla was going to watch the inside of the casita to ensure that no one else sold drugs.

On the night of September 19, 2008, Hernandez and Bonilla returned to the casita. Hernandez sold drugs to the casita's customers while Bonilla sat by himself near the kitchen.

The next night, Bonilla returned to the casita with two men, one of whom Bonilla told Palacios would be selling drugs; Hernandez did not come to the casita that night. A group of three men and a group of transvestites also came to the casita. Throughout most of the night, Valdez watched the casita's entrance, Palacios served beer from the kitchen, the three men hung out in the casita's living room, some of the transvestites played cards in a bedroom, and Bonilla sat silently by himself near the kitchen.

Around 3:30 a.m. on September 21, 2008, after a long night of drinking, Jose Enriquez Mendez, who lived above the casita, and his brother, similarly named Jose Alfredo Enriquez Mendez (the victim), returned to the apartment complex where the casita was located. The victim suggested they check out what was going on at the casita, but his brother refused because he was too tired. The victim then went to the casita alone.

When the victim entered the casita, Valdez noticed he was very drunk, and she tried to turn him away. The victim refused and asked Valdez to bring him a beer. One of the three men in the living room then approached Valdez and touched her shoulder. The victim told the man not to touch Valdez. The victim then announced he was a cholo who belonged to 18th Street, a local gang, and he claimed no one at the casita could touch him. As the victim was saying these things, Valdez noticed Bonilla was watching angrily from the kitchen.

5

The victim eventually began joking with the three men in the living room. However, he continued saying he was from 18th Street, and at one point he lifted his shirt to reveal a small tattoo of the number "18" located on the left side of his chest. Bonilla continued to watch the victim.

After the victim lifted his shirt to reveal his tattoo, Valdez saw Bonilla pick up his phone. At that point, Valdez went up to Bonilla to tell him everything was fine and to calm down. Bonilla told Valdez he was texting his brother about what was happening in the casita. He then said he was not the type of person that would put up with much, and that he did not care about "what could happen."

Around the same time, Palacios approached the victim and told him he needed to leave the casita. The victim told Palacios that they need to look out for each other. The victim then stepped out the front door to call his brother. While outside, the victim asked his brother to pick him up from the casita because he believed someone was "tripping on him."

Not long after the victim stepped outside, Bonilla got up and made his way to the front door. Valdez tried to stop Bonilla but he pushed her out of the way and exited the casita. According to Valdez, the victim and Bonilla were the only people outside the casita at that time.

Once outside, Bonilla approached the victim as Valdez watched from the doorway. While the victim was still on the phone, Bonilla punched him in the head. Bonilla then pulled out a gun and shot the victim in the front left shoulder. The victim tried to run away but Bonilla shot him three more times, killing him. In total, Bonilla shot the victim four times: twice in the front left shoulder, once in the right side of the neck, and once in the back of the head.[3] The shots to the victim's head and neck were

---

[3]     Valdez testified that she saw Bonilla fire only three shots; however, the medical examiner who conducted the victim's autopsy testified that the victim had been shot four times.

6

fatal. After shooting the victim, Bonilla ran from the casita down an alleyway across the street.

2. *The Investigation*

After the shooting, Valdez called the police. When officers from the Los Angeles Police Department (LAPD) arrived, Valdez did not tell them she had seen who shot the victim. According to Valdez, she was hesitant to get involved with the LAPD's investigation because she was afraid she would be arrested for operating an illegal business. However, she eventually told an LAPD detective that she saw Bonilla shoot the victim.

During the same interview, Valdez provided the detective with the phone number she used to contact Hernandez. At the detective's direction, Valdez called Hernandez's phone. When Hernandez answered the phone, Valdez asked: "Is the man okay?" Hernandez told Valdez the other man was okay. Hernandez also told Valdez not to worry because he was going to move to another casita.

During the LAPD's investigation of the murder scene, a phone clip was recovered outside the casita's front door. A DNA profile later taken from the phone clip was consistent with a DNA sample obtained from a buccal swab of Bonilla's mouth.

On November 7, 2008, the LAPD arrested Hernandez at his apartment located on La Salle Avenue in Los Angeles. After arresting Hernandez, the LAPD interviewed his girlfriend, Demetria Ramos. Demetria told the police she lived with Hernandez and Bonilla at the La Salle apartment. She also said she and Hernandez shared several vehicles, including a burgundy Toyota Tundra with doors that opened vertically, a white two-door Honda, and two motorcycles. According to Demetria, Hernandez had recently been working as a manager at the Barra Latina, which was located near the casita. Demetria also told the police Hernandez had several tattoos of the letters "M.S." on his body, and that he had once told her he used to be in a gang.

After interviewing Demetria, the police obtained her phone records. According to those records, the phone number Valdez told the police belonged to Hernandez was

7

registered in Demetria's name. Demetria later confirmed that Hernandez often used one of the phones registered in her name.

Demetria's phone records for September 21, 2008 showed that several calls and text messages were exchanged shortly before the victim's murder between the number linked to Hernandez and a number registered to a prepaid cell phone.[4] The LAPD could not trace the prepaid phone or obtain any records of the phone's calls or text messages. However, while the LAPD was conducting surveillance of the La Salle apartment several days after Hernandez's arrest, a detective obtained a receipt for a parcel delivered to the apartment, which had the name "Boris" written on it, along with a phone number matching the number registered to the prepaid phone. Additionally, during the LAPD's interview with Demetria, a detective searched her phone and found a contact listed under the name "Boris." The "Boris" contact listed the same number registered to the prepaid phone.

On December 8, 2008, Bonilla was arrested inside Barra Latina. Officers from the LAPD's K-9 unit found Bonilla hiding in an alcove behind a jukebox. When the officers found him, Bonilla was clutching a cell phone. A subsequent search of the cell phone revealed a sent text message written in Spanish that, as translated into English, read: "I almost had a fight with Moreno, the homie, the one who wants to -- the one who wants to take away from me that of the streets." The prosecution's gang expert later testified that the Moreno referenced in Bonilla's text was a shot-caller for one of Mara Salvatrucha's (MS) local cliques.

During Bonilla's booking, LAPD officers took photographs of Bonilla's tattoos. According to one of the detectives, Bonilla had the letters "M.S." tattooed on the back of his head. Valdez also testified that she saw the word "Sur" tattooed on Bonilla's neck.

---

[4]     The LAPD was unable to obtain the content of the text messages from the phone registered to Demetria because the phone's network automatically purged the content of the phone's text messages five days after the phone's messages were sent.

### 3. Gang Evidence
#### A. LAPD Gang Testimony

LAPD Detective Frank Flores, who specializes in MS, testified as the prosecution's gang expert. According to Detective Flores, Bonilla is a documented member of MS, and he has several tattoos reflecting his membership in MS, as well as other tattoos reflecting his affiliation with a larger gang, the Mexican Mafia. Detective Flores also testified that Hernandez has several tattoos reflecting his associations with MS and the Mexican Mafia. In Detective Flores's opinion, both Bonilla and Hernandez were members of MS at the time of the victim's murder.

According to Detective Flores, MS's primary gang activities are extortion and drug sales. MS usually extorts businesses located within its territory by demanding payments from those businesses in exchange for MS agreeing to protect the businesses from local gangs.

MS's primary rival is 18th Street. According to Detective Flores, if an individual claims 18th Street affiliation in the presence of an MS member, the MS member will likely assault, or even kill, that individual. Detective Flores testified that in his almost 16-year career, there had been a couple of hundred murders between MS and 18th Street.

Detective Flores also testified that the casita and Barra Latina are located in MS territory. According to Detective Flores, if an individual leaves a gang (such as MS), it would be dangerous for that individual to continue to associate around, or work in, establishments located in the gang's territory because that individual would be viewed as a liability once he left the gang.

Detective Flores also answered several questions about a hypothetical based on MS members taxing a casita located within the gang's territory. Detective Flores opined that in the event an MS member monitoring the casita was provoked by an individual inside the casita claiming an association with 18th Street, that member would likely assault or kill the individual claiming the rival gang's association. However, the MS member would likely have to obtain permission from a higher ranking MS member before assaulting or killing that individual.

9

## B. Defense Expert Gang Testimony

Alex Alonso, who has studied gangs since 1993, testified as a gang expert for the defense. Before testifying in the instant case, Alonso had testified in approximately five cases involving MS.

Alonso agreed that the casita and Barra Latina are located in MS territory, and that 18th Street is one of MS's primary local rivals. However, he disputed whether MS and 18th Street's feud was responsible for nearly 200 murders in Los Angeles. He also opined that encounters between MS and 18th Street members do not always result in violence. Additionally, he testified that larger prison gangs, such as the Mexican Mafia, have started to encourage smaller street gangs to decrease their animosity toward each other to increase money flow among all street and prison gangs.

Alonso opined that not all crimes committed by gang members are committed for the benefit of their gang. In his opinion, one must look at the circumstances surrounding the crime to determine whether it was committed for the benefit of a gang.

When shown photographs of Bonilla's tattoos, Alonso agreed that the word "Sur" and the letters "M.S." were gang-related. However, he opined that Bonilla's tattoos appeared faded, indicating that Bonilla had started the process of having those tattoos removed. According to Alonso, if a gang member with gang-related tattoos begins the process of removing those tattoos, it is an indication that the gang member is trying to obtain a job or distance himself from the gang. In response to a hypothetical based on evidence of Bonilla's gang-related tattoos and his alleged attempts to have them removed, Alonso opined that such evidence indicated the individual with the tattoos was likely an inactive gang member.

Alonso was presented a different hypothetical in which a woman opened a casita and approached a man at a local bar to ask for help bringing in customers to the casita. The man and the woman reached an agreement through which the woman would pay the man a fee to bring in customers and provide security for the casita. During all conversations between the man and the woman, the man never mentioned his membership in a gang and made no mention of a gang name. Based on this hypothetical,

10

Alonso was unable to conclude whether an extortion was committed for the benefit of a gang. In response to another hypothetical based on the events immediately leading up to the victim's murder, Alonso was unable to conclude whether the killing was committed for the benefit of MS.

## PROCEDURAL BACKGROUND

An information filed on April 26, 2011, charged Bonilla and Hernandez with murder (Pen. Code, § 187, subd. (a), count 1)[5] and attempted extortion (§§ 664/524, count 2), along with gang enhancements (§ 186.22, subd. (b)) as to both crimes. As to count 1, the information alleged a principal personally and intentionally used a handgun and proximately caused great bodily injury and death (§ 12022.53, subds. (b), (c), (d), & (e)(1)). The information further alleged Hernandez had previously been convicted of a serious or violent felony (§ 667, subds. (b)-(i)). The information also charged Hernandez with assault with a deadly weapon (§ 245, subd. (a)(1), count 3); however, that charge was dismissed before the evidence phase of trial.

Following a jury trial, both Bonilla and Hernandez were found guilty of first degree murder and attempted extortion. The jury also found true the gang allegations as to both Bonilla and Hernandez. As to Bonilla, the jury found true the personal firearm-use allegations (§ 12022.53, subds. (b), (c), (d), & (e)). As to Hernandez, the jury found true the principal firearm-use allegations (§ 12022.53, subds. (d) & (e)). At the sentencing hearing, the prosecution dismissed the prior conviction allegation against Hernandez.

Bonilla and Hernandez were both sentenced to prison terms of 50 years to life, consisting of terms of 25 years to life for the murder convictions and 25 years to life for the firearm enhancements. As to the attempted extortion convictions, the court stayed imposition of mid-term two-year sentences as to both Bonilla and Hernandez pursuant to section 654. Among other fines and fees that are not challenged here, the trial court

---

[5] All further statutory references are to the Penal Code unless otherwise specified.

11

ordered Bonilla and Hernandez to pay $7,680 for victim restitution. The trial court awarded Bonilla 1,238 days of custody credit, and it awarded Hernandez 1,269 days of custody credit. Bonilla and Hernandez timely appealed their convictions.[6]

## DISCUSSION[7]

### I. The Trial Court's Error in Instructing on the Natural and Probable Consequences Doctrine Was Harmless Beyond a Reasonable Doubt

After this case was fully briefed, our Supreme Court decided *Chiu*, in which the court held first degree premeditated murder cannot be the natural and probable consequence of a crime a defendant aided and abetted.[8] (*Chiu*, *supra*, 59 Cal.4th at pp. 158-159.) Bonilla and Hernandez contend their convictions for first degree murder must be reversed because the trial court instructed the jury on the natural and probable consequences doctrine as a basis upon which it could convict them of first degree murder. Although we find the trial court erred in instructing on the natural and probable consequences doctrine as a basis upon which the jury could convict defendants of first degree murder, we find the error harmless beyond a reasonable doubt as to both defendants.

#### A. *The Supreme Court's Decision in* <u>Chiu</u>

In *Chiu*, the defendant was convicted of first degree premeditated murder after he was involved in a brawl during which one of his friends grabbed a gun and killed one of the brawl's participants. (*Chiu*, *supra*, 59 Cal.4th at pp. 160-161.) There was conflicting evidence about whether the defendant had instructed his friend to grab the gun and shoot

---

[6] Bonilla also filed a separate petition for a writ of habeas corpus on June 3, 2013. We have denied that writ petition through a separate order.

[7] Defendants join in each other's arguments to the extent those arguments inure to their benefit.

[8] Because the Supreme Court decided *Chiu* after this case was fully briefed, we requested supplemental briefing to address the effect of that decision, if any, on the instant appeals.

the victim. (*Id.* at p. 160.) The prosecution pursued the defendant's conviction for first degree premeditated murder under two aider and abettor theories: a direct aiding and abetting theory and a natural and probable consequences theory. (*Ibid.*) Accordingly, the trial court instructed the jury that it could convict the defendant of first degree murder if it found that he either directly aided and abetted the murder or aided and abetted the target offense of assault or disturbing the peace, the natural and probable consequence of which was murder. (*Ibid.*) The Supreme Court held the trial court erred in instructing the jury that it could convict the defendant of first degree premeditated murder under the natural and probable consequences doctrine. (*Id.* at pp. 159-160.)

The Supreme Court began its analysis by summarizing the principles underlying the natural and probable consequences doctrine. "'""A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime."' [Citation.] 'Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault.' [Citation.]" (*Chiu*, *supra*, 59 Cal.4th at p. 161.) "A nontarget offense is a 'natural and probable consequence' of the target offense if, judged objectively, the additional offense was reasonably foreseeable. [Citation.] The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense. [Citation.] Rather, liability "'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted."' [Citation.] Reasonable foreseeability 'is a factual issue to be resolved by the jury.' [Citation.]" (*Id.* at pp. 161-162.)

In holding the trial court's instruction on the natural and probable consequences doctrine was error, the Supreme Court observed, "'[b]ecause the nontarget offense [under the natural and probable consequences doctrine] is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply

13

because a reasonable person could have foreseen the commission of the nontarget crime.' [Citation.]" (*Chiu, supra,* 59 Cal.4th at p. 164.)  The court reasoned that because the aider and abettor's mens rea is irrelevant, "the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine . . . ." (*Id*. at p. 166.)  The court then held, "punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*Ibid*.)

The Supreme Court added that its holding with respect to the natural and probable consequences doctrine did not preclude an aider and abettor from being convicted of first degree premeditated murder under felony murder and direct aiding and abetting principles.  (*Chiu, supra,* 59 Cal.4th at pp. 166-167.)  The court stated, "Under [direct aiding and abetting] principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.  [Citation.]  Because the mental state component—consisting of intent and knowledge—extends to the entire crime, it preserves the distinction between assisting the predicate crime of second degree murder and assisting the greater offense of first degree premeditated murder.  [Citations.]  An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent.  Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*Ibid*.)

After holding the trial court erred in instructing the jury on the natural and probable consequences doctrine, the Supreme Court turned to the issue of prejudice. (*Chiu*, *supra*, 59 Cal.4th at pp. 167-168.)  The court observed, "[w]hen a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground.  [Citations.]" (*Id*. at p. 167.)  The record in *Chiu* indicated

14

the jury may have relied on the natural and probable consequences doctrine in convicting the defendant of first degree premeditated murder. (*Id*. at p. 168.) Accordingly, the Supreme Court reversed the defendant's conviction because it could not conclude beyond a reasonable doubt the jury relied on a different and legally valid theory. (*Ibid*.) In doing so, the Supreme Court offered the People the opportunity to accept a reduction of the defendant's conviction to second degree murder or retry the defendant's case. (*Ibid*.)

## B. The Trial Court's Instructions

Here, the trial court instructed the jury that it could convict each defendant of murder on at least one of three theories: (1) the victim's death was the natural and probable consequence of defendants' attempted extortion or offer to sell drugs; (2) the victim was killed with malice aforethought; or (3) the victim was killed during the commission of an inherently dangerous felony. With respect to the natural and probable consequences doctrine, the trial court instructed the jury in pertinent part as follows: "A person is guilty of a crime whether he committed it personally or aided and abetted the perpetrator. [¶] Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime. [¶¶] Before you may decide whether the defendant is guilty of murder on an aiding and abetting theory, you must decide whether he is guilty of attempted extortion. [¶] To prove that the defendant is guilty of murder, the People must prove that:

"1.     The defendant is guilty of attempted extortion;

"2.     During the commission of the attempted extortion, a coparticipant in that attempted extortion committed the crime of murder; [and]

"3.     Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the attempted extortion."   In addition to attempted extortion, the trial court instructed the jury that the crime of offering to sell drugs also constituted a target offense under the prosecution's natural and probable consequences theory.

15

The trial court also instructed the jury on the elements of the felony murder rule (CALCRIM No. 540B). Finally, the trial court instructed that, while every member of the jury was required to agree the prosecution proved each defendant committed murder under at least one of the three theories alleged, the jury was not required to reach a unanimous decision as to which theory the prosecution proved (CALCRIM No. 548).

### C. *Hernandez's Conviction*

The jury convicted Hernandez of first degree murder. Hernandez contends that, in light of *Chiu*, the trial court erred when it instructed the jury that it could convict him of first degree premeditated murder under a natural and probable consequences theory. (See *Chiu*, *supra*, 59 Cal.4th at p. pp. 159-160.) The People agree the instruction was error but argue the error was harmless beyond a reasonable doubt because, if the jury relied on the erroneous natural and probable consequences theory, it necessarily made the findings required to support a first degree murder conviction under the legally valid felony murder theory.

As the Supreme Court recognized in *Chiu*, when the trial court instructs the jury on more than one theory of guilt, one of which was legally incorrect and the others legally correct, "reversal is required unless there is a basis in the record to find [beyond a reasonable doubt] that the verdict was based on a valid ground." (*Chiu*, *supra*, 59 Cal.4th at p. 167, citing *People v. Guiton* (1993) 4 Cal.4th 1116, 1128-1129.) Similarly, if the reviewing court can determine beyond a reasonable doubt that any reliance the jury may have placed on the legally incorrect theory establishes that the jury necessarily made the required findings to support a conviction under a legally valid theory, the trial court's error in instructing on the legally incorrect theory is harmless beyond a reasonable doubt. (*People v. Chun* (2009) 45 Cal.4th 1172, 1204-1205 (*Chun*).)

The People argue that in light of the evidence presented at trial, the instructions provided to the jury, and the fact that attempted extortion and offering to sell drugs served as the underlying crimes for the natural and probable consequences theory (i.e., the target crimes) and the felony murder theory (i.e., the crimes giving rise to the underlying burglary), any reliance the jury may have placed on the natural and probable

16

consequences doctrine in convicting Hernandez necessarily demonstrates the jury also made the findings required to support a first degree murder conviction under a felony murder theory. Accordingly, the People assert the trial court's error in instructing on the natural and probable consequences doctrine was harmless beyond a reasonable doubt. (See *Chun*, *supra*, 45 Cal.4th at p. 1205.) We agree.

In arguing the trial court's error was harmless, the People rely on our Supreme Court's decision in *Chun*. In that case, the defendant was involved in the drive-by shooting of an occupied vehicle, which killed one passenger and injured two. (*Id*. at p. 1179.) After he was arrested, the defendant admitted that he fired a gun out of the car in which he was riding, but claimed that he did not point the gun at anyone; he told the police that he just wanted to scare the other car's occupants. (*Ibid*.) The defendant was charged with murder, attempted murder, discharging a firearm from a vehicle, and shooting into an occupied vehicle, all with firearm-use allegations. (*Ibid*.) The prosecution sought a first degree murder conviction, and the trial court also instructed the jury on second degree felony murder based on shooting at an occupied vehicle on both direct perpetrator and direct aider and abettor theories. (*Ibid*.) The jury convicted the defendant of second degree murder. (*Ibid*.)

The Supreme Court held the trial court erred in instructing on second degree felony murder because the underlying assaultive felony of shooting at an occupied vehicle merged with the homicide. (*Chun*, *supra*, 45 Cal.4th at pp. 1197-1205.) Nevertheless, it found the error harmless beyond a reasonable doubt. (*Ibid*.) In finding the trial court's error harmless, the Supreme Court applied the following test: an error is harmless "only if the jury verdict on other points effectively embraces this one or if it is impossible, upon the evidence, to have found what the verdict *did* find without finding this point as well." (*Id*. at p. 1204, citing *California v. Roy* (1996) 519, U.S. 2, 7 [136 L.Ed.2d 266, 117 S. Ct. 337] (conc. opn. of Scalia, J.).) Phrasing the test another way, if "other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary for [a valid theory supporting the defendant's murder conviction], the erroneous [] instruction was harmless." (*Chun*, *supra*, 45 Cal.4th at p. 1205.)

17

Applying this test, the Supreme Court found the trial court's error was harmless beyond a reasonable doubt because, if the jury relied on the second degree felony murder instruction in convicting the defendant, it necessarily found the defendant acted with conscious-disregard-for-life malice, which supported a conviction for second degree murder under a valid implied malice theory. (*Chun*, *supra*, 45 Cal.4th at p. 1205.) Specifically, the court observed that, under the felony murder instruction given by the trial court, the jury would have had to find the defendant willfully and maliciously shot a firearm at an occupied vehicle or aided and abetted the shooting of a firearm at an occupied vehicle to support a conviction under a felony murder theory. (*Ibid.*) The court reasoned that no juror could have made such a finding without also finding the defendant committed an act that was dangerous to life, and that he did so knowing of the danger and with conscious disregard for life, which supported a second degree murder conviction under an implied malice theory. (*Ibid.*)

Similar reasoning applies here to lead us to conclude the trial court's error in instructing the jury on the natural and probable consequences doctrine was harmless beyond a reasonable doubt: if the jury relied on the natural and probable consequences doctrine in convicting Hernandez of murder, it necessarily found he aided and abetted the commission of the burglary supporting a conviction under a felony murder theory.

Under the felony murder rule, "[a] murder which is . . . committed in the perpetration of, or attempt to perpetrate, . . . burglary, . . . is murder of the first degree." (§ 189; see also *People v. Cavitt* (2004) 33 Cal.4th 187, 197 (*Cavitt*).) The jury was instructed on felony murder pursuant to CALCRIM No. 540B, which sets forth the elements of felony murder where the defendant is accused of aiding and abetting the perpetrator of the killing in the commission of the underlying felony.[9] The jury was

---

[9]    The trial court instructed the jury as follows: "The defendants may be guilty of murder, under a theory of felony murder, even if another person did the act that resulted in the death. . . . [¶] To prove that a defendant is guilty of first degree murder under this theory, the People must prove that: [¶] 1. The defendant committed or aided and abetted burglary; [¶] 2. the defendant intended to commit, or intended to aid and abet the perpetrator in committing the burglary; [¶] 3. If the defendant did not personally commit

18

instructed that burglary was the underlying felony, and it was separately provided instructions on the elements of burglary and the elements of the intended felonies underlying the burglary allegation, namely extortion and offering to sell a controlled substance. Additionally, with respect to the underlying burglary allegation, the jury was correctly instructed that, while it was required to find Hernandez possessed the intent to aid and abet the commission of one of the felonies giving rise to the underlying burglary, it was not required to unanimously agree on which felony Hernandez intended to aid and abet. (See *People v. Failla* (1966) 64 Cal.2d 560, 569 (*Failla*) ["[I]n prosecutions for burglary, as in murder and theft cases, the jurors need not be instructed that to return a verdict of guilty they must all agree on the specific 'theory' of the entry - i.e., what particular felony or felonies the defendant intended at the time-provided they are told they must be unanimous in finding that a felonious entry took place."]; *People v. Russo* (2001) 25 Cal.4th 1124, 1132-1133 ["If . . . the evidence showed a single entry, but possible uncertainty as to the exact burglarious intent, that uncertainty would involve only the theory of the case and not require the unanimity instruction."]; see also *id*. at p. 1132 ["[W]here the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty."].)

If the jury relied on the natural and probable consequences doctrine, it would have found Hernandez aided and abetted either attempted extortion or offering to sell a controlled substance. As noted above, to convict Hernandez under a felony murder theory, the jury was not required to unanimously agree on which felony giving rise to the

---

or attempt to commit burglary then a perpetrator, whom the defendant was aiding and abetting, personally committed or attempted to commit burglary; [¶] 4. While committing or attempting to commit burglary, the perpetrator caused the death of another person; [¶] AND [¶] 5. There was a logical connection between the cause of death and the burglary. The connection between the cause of death and the burglary must involve more than just their occurrence at the same time and place. [¶¶] The defendant must have intended to commit the burglary before or at the time that he caused the death."

underlying burglary allegation Hernandez intended to aid and abet. (See *Failla*, *supra*, 64 Cal.2d at p. 569). Accordingly, the jury's reliance on the natural and probable consequences doctrine necessarily demonstrates that it found Hernandez aided and abetted the burglary underlying the prosecution's felony murder theory, where the same felonies underlying the prosecution's natural and probable consequences theory gave rise to the burglary underlying the prosecution's felony murder theory.

Additionally, if the jury followed the trial court's instruction on the natural and probable consequences doctrine, it would have also found the victim's murder was a natural and probable consequence of either attempted extortion or offering to sell a controlled substance. Under the circumstances of this case, no juror could have made this finding without also finding that the victim's murder was logically connected to Hernandez's involvement in the burglary underlying the prosecution's felony murder theory.

To support a conviction under a felony murder theory, there needs to be a logical connection beyond mere coincidence of time and place between the underlying felony and the act resulting in death. (*Cavitt*, *supra*, 33 Cal.4th at p. 200.) However, this does not require that the murder furthered or facilitated the underlying felony, or that the murder was even a foreseeable consequence of the underlying felony. (*Ibid*.) "The felony-murder rule is not . . . limited to killings which seem 'probable'; it includes 'a variety of unintended homicides resulting from reckless behavior, or ordinary negligence, or pure accident; it embraces both calculated conduct and acts committed in panic or rage . . . ; and *it condemns alike consequences that are highly probable, conceivably possible, or wholly unforeseeable.*' [Citation.]" (*People v. Anderson* (1991) 233 Cal.App.3d 1646, 1658 (*Anderson*); original italics.)

Here, the same evidence supports Hernandez's conviction for murder under a natural and probable consequences theory and a felony murder theory. More specifically, the same evidence establishes that the victim's murder was both a natural and probable consequence of a crime Hernandez aided and abetted (attempted extortion or offering to sell a controlled substance) and logically connected to the burglary of the casita, where

20

Hernandez intended to aid and abet the underlying felony of attempted extortion or offering to sell a controlled substance.

Hernandez does not dispute that he and Bonilla attempted to extort Valdez and Palacios, and he does not dispute that he initiated, and participated in, the drug-sales scheme at the casita. Hernandez also does not dispute that he ordered Bonilla to provide security at the casita on the night of the murder. Further, the undisputed evidence established that Bonilla, and not another individual, killed the victim. Finally, the jury found Bonilla and Hernandez committed murder and attempted extortion for the benefit of a criminal street gang, a finding neither defendant challenges on appeal. These undisputed facts and findings are consistent with the prosecution's gang expert's testimony that, when a gang is in the process of extorting the owners of a casita or controlling the sale of drugs within a casita, if a member of a rival gang threatens to disrupt the operation of that casita, the controlling gang's member responsible for providing security at the casita will protect the controlling gang's interest in the extortion or drug-sales scheme by assaulting or killing the threatening rival gang member.

In light of these circumstances, no juror could find the victim's murder was a natural and probable consequence of the crime of aiding and abetting attempted extortion or offering to sell drugs but not logically connected to Hernandez's aiding and abetting the burglary of the casita, where attempted extortion and offering to sell drugs were the felonies giving rise to the burglary allegation underlying the prosecution's felony murder theory. (See *Anderson*, *supra*, 233 Cal.App.3d at p. 1658 [felony murder's logical connection requirement encompasses consequences of the underlying felony that are highly probable, conceivably possible, or wholly unforeseeable].) Accordingly, the trial court's error in instructing on the natural and probable consequences doctrine as a theory supporting a first degree murder conviction was harmless beyond a reasonable doubt.[10] (See *Chun*, *supra*, 45 Cal.4th at p. 1205.)

---

[10] Because we conclude the jury's reliance on the trial court's natural and probable consequences instruction necessarily demonstrates that the jury made the findings required to convict Hernandez of first degree murder under a felony murder theory, we

21

## D. Bonilla's Conviction

The jury also convicted Bonilla of first degree murder. In doing so, the jury found true the allegation that Bonilla personally and intentionally discharged a firearm causing death to the victim (§ 12022.53, subd. (d)).

Like in Hernandez's case, the trial court erred in instructing the jury that it could convict Bonilla of first degree murder under a natural and probable consequences theory. (See *Chiu*, *supra*, 59 Cal.4th at pp. 158-159.) In Bonilla's case, we conclude such error was harmless beyond a reasonable doubt because the record demonstrates the jury based its verdict on a direct liability theory of first degree murder.

"Aider and abettor culpability under the natural and probable consequences doctrine is vicarious in nature." (*Chiu*, *supra*, 59 Cal.4th at p. 164, citing *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5.) It is this vicarious nature that renders a conviction for first degree murder under the natural and probable consequences doctrine improper because under that doctrine the intent of the aider and abettor in facilitating the nontarget murder is irrelevant. (See *Chiu*, *supra*, 59 Cal.4th at pp. 164-166 [under the natural and probable consequences doctrine, "the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder . . . , especially in light of the severe penalty involved"].) However, as already noted, the Supreme Court in *Chiu* acknowledged that, where a jury convicts a defendant of first degree murder and, in doing so, demonstrates that it found the defendant acted with the appropriate intent, a trial court's erroneous instruction on the natural and probable consequences doctrine as a grounds upon which the jury could convict the defendant of first degree murder is harmless. (*Ibid.*; see also *Chun*, *supra*, 45 Cal.4th at p. 1205.) Accordingly, where a jury convicts a defendant of first degree murder and also finds true separate allegations requiring the defendant's personal culpability, such as special-circumstance and firearm-use allegations, the jury's verdicts

_____

need not and do not address Hernandez's argument that the trial court's instruction on the natural and probable consequences doctrine pursuant to former CALCRIM No. 403 was impermissibly ambiguous.

on those allegations demonstrate the jury did not rely on the erroneous theory of vicarious liability. (See *People v. Ledesma* (2006) 39 Cal.4th 641, 718 (*Ledesma*).)

Here, the trial court instructed the jury as follows with respect to the personal firearm-use allegation under section 12022.53, subdivision (d): "If you find Boris Bonilla guilty of murder, you must then decide whether the People have proved the additional allegation that [Bonilla] personally and intentionally discharged a firearm during that crime causing death. [¶] To prove this allegation, the People must prove that:

"1. The defendant personally discharged a firearm during the commission of that crime;

"2. The defendant intended to discharge the firearm; [and]

"3. The defendant's act caused the death of a person."

The jury returned a true finding as to this allegation. We conclude the jury's true finding establishes "a basis in the record to find that [Bonilla's] verdict was based on a valid ground." (*Chiu*, *supra*, 59 Cal.4th at p. 167.)

In finding true the personal firearm-use allegation, the jury found Bonilla personally and intentionally fired a gun at the victim, killing him. Bonilla does not dispute this finding, and the finding is supported by the evidence. Valdez watched as Bonilla followed the victim outside the casita, punched the victim in the head, and shot the victim four times. Immediately after hearing gunshots while talking to the victim on the phone, the victim's brother saw Bonilla running from the casita. Further, the evidence establishes that Bonilla was the only person who shot the victim: Valdez testified that Bonilla and the victim were the only people outside the casita at the time of the shooting, and no evidence was introduced suggesting otherwise.

Aside from the jury's firearm-use finding and the undisputed evidence identifying Bonilla as the individual who shot the victim, the prosecutor's arguments provide an additional basis for determining that the jury did not rely on the natural and probable consequences doctrine in convicting Bonilla of first degree murder. In pursuing Bonilla's first degree murder conviction, the prosecution relied on a direct liability theory. The prosecutor consistently referred to Bonilla as the "shooter" and the direct perpetrator of

23

the crime. The prosecutor also distinguished between the types of liability that would support each defendant's conviction for murder. For example, when explaining the felony murder and natural and probable consequences theories to the jury, the prosecutor argued that the jury did not "need these . . . legal theories [for Bonilla] because he is a shooter."

In light of the jury's finding that Bonilla personally and intentionally shot the victim, the undisputed evidence establishing that Bonilla shot and killed the victim, and the prosecution's reliance on a direct liability theory in arguing for Bonilla's murder conviction, we conclude beyond a reasonable doubt that the jury relied on a legally valid theory in convicting Bonilla of first degree murder. (See *Chiu*, *supra*, 59 Cal.4th at p. 167; see also *Ledesma*, *supra*, 39 Cal.4th at p. 718.)

## II. Sufficient Evidence Supports Hernandez's Murder Conviction

As noted above, the trial court instructed the jury that it could convict Hernandez of murder under three theories: (1) natural and probable consequences; (2) malice aforethought; and (3) felony murder. Hernandez contends insufficient evidence supports his murder conviction under any of these theories.

### A. Standard of Review

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Avila* (2009) 46 Cal.4th 680, 701 (*Avila*).) In determining whether there was sufficient evidence to support a jury's finding, we must determine whether, after reviewing the entire record in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Ibid.*) We neither reweigh evidence nor reevaluate the credibility of witnesses. (*People v. Linbderg* (2008) 45 Cal.4th 1, 27.) "This standard applies whether direct or circumstantial evidence is involved." (*Avila*, *supra*, 46 Cal.4th at p. 701.)

24

"The standard of review is the same in cases in which the People rely mainly on circumstantial evidence." (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. [Citations.]" (*Id.* at pp. 507-508.) "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]" (*Id.* at p. 508.) Therefore, before we may set aside the judgment, it must be clear that "upon no hypothesis whatever is there sufficient evidence to support it." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Where the defendant's conviction is premised on more than one theory of guilt, and one of those theories is not supported by sufficient proof, the defendant's conviction will be upheld so long as sufficient evidence supports a different and valid theory of guilt, and the record does not affirmatively show that the jury relied on the unsupported ground. (*People v. Guitton* (1993) 4 Cal.4th 1116, 1128-1129; see also *People v. Marks* (2003) 32 Cal.4th 197, 233 (*Marks*).)

### B. Felony Murder

Hernandez contends insufficient evidence supports his conviction for murder under a felony murder theory. Specifically, he argues there was no logical connection between Bonilla's killing of the victim and defendants' burglary of the casita. He asserts the murder directly stemmed from Bonilla's desire to maintain respect for Mara Salvatrucha, and that it shared no relationship with defendants' extortion or drug-sales schemes underlying their burglary of the casita.

As noted, under the felony murder rule, an aider and abettor in a burglary is criminally liable for any murder committed by the perpetrator who is being aided and abetted, where the murder and the underlying burglary share a logical connection and occur as part of a continuous transaction. (*Cavitt*, *supra*, 33 Cal.4th at p. 200; see also §

25

189.) A logical connection requires more than a mere coincidence of time and place between the burglary and the act resulting in death, but the killing is not required to have actually furthered or facilitated the underlying burglary. (*Cavitt*, *supra*, 33 Cal.4th at p. 200.) Further, there does not need to exist a strict causal or temporal relationship between the burglary and the killing; rather, the burglary and the killing need only be part of one continuous transaction. (*People v. Wilkins* (2013) 56 Cal.4th 333, 340.)

Substantial evidence supports Hernandez's murder conviction under a felony murder theory. First, we acknowledge that Hernandez does not challenge the sufficiency of the evidence supporting his attempted extortion conviction. Further, Hernandez does not challenge the sufficiency of the evidence establishing that he aided and abetted Bonilla's burglary of the casita, through either his extortion or drug sales scheme. Rather, he argues there was no logical connection between the burglary and the victim's murder. We disagree.

Hernandez's uncharged burglary giving rise to the felony murder charge was premised on his aiding and abetting the crimes of attempted extortion and offering to sell a controlled substance. To facilitate these crimes, Hernandez ordered Bonilla to watch over the casita to ensure no one interfered with Hernandez's drug-sales or revenue-collection arrangements. The victim's murder was logically connected to, and part of the same continuous transaction as, these arrangements.

Defendants were members of MS, and MS's primary rival is 18th Street. MS's primary criminal activities are extortion and drug sales. Defendants approached Valdez and Palacios to extort money from their (Valdez's and Palacios's) casita operation. Hernandez also established the arrangement to sell drugs inside the casita and, on occasion, he actually sold drugs there. To ensure no one interfered with the extortion and drug-sales schemes, Hernandez arranged for Bonilla to watch over the casita. While Bonilla was monitoring the casita, he killed the victim outside the casita's front door immediately after the victim announced to the casita's patrons his association with 18th Street and claimed that no one inside the casita could "touch him." Bonilla's conduct was consistent with the prosecution's gang expert's testimony that gang members

26

involved with the extortion of a casita are likely to assault or kill a rival gang member who threatens to disrupt the controlling gang's interest in the casita.

In light of the foregoing, we conclude the evidence established a logical connection between the murder of the victim, who was claiming membership in Hernandez's rival gang, and Hernandez's involvement in the burglary of the casita, where Hernandez ordered the perpetrator of the killing to monitor the casita for the purpose of protecting Hernandez's and MS's interests in the extortion and drug-sales schemes. Accordingly, we find there was substantial evidence to support Hernandez's murder conviction under a felony murder theory.

Because we conclude substantial evidence supports Hernandez's conviction for murder under a felony murder theory, we need not and do not reach the issue of whether substantial evidence supports Hernandez's conviction under a malice aforethought theory. (See *Marks*, *supra*, 31 Cal.4th at p. 233 ["even if we assume that the jury considered [one theory of murder] and insufficient evidence supported it, defendant's . . . murder conviction remains valid . . . [b]ecause there was sufficient evidence showing [the victim's] murder was [committed pursuant to a separate, valid theory]."].)[11]

## III. Hernandez Failed To Preserve His Challenge to the Trial Court's Admission of Bonilla's Statement Made to Valdez

Hernandez next contends the trial court erred in admitting Bonilla's statement made to Valdez, through which Bonilla told Valdez he was sending Hernandez a text

---

[11] We reject Hernandez's argument that the trial court erred in instructing the jury on felony murder as a theory for convicting Hernandez of murder. Hernandez argues the trial court should not have instructed on felony murder because the evidence did not establish a logical connection or a continuous transaction linking the victim's murder to the uncharged burglary. We disagree for the reasons expressed in our discussion of the substantial evidence supporting Hernandez's conviction for murder under a felony murder theory. Because substantial evidence supports a jury finding that the victim's murder was logically connected to, and part of the same continuous transaction as, the burglary Hernandez aided and abetted, the trial court properly instructed the jury on felony murder as a theory under which it could convict Hernandez of murder. (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1311.)

27

message about what was happening at the casita immediately before he killed the victim. Hernandez challenges the trial court's admission of this statement on the ground that it was inadmissible hearsay and violated his right to confront an accusing witness.

As a preliminary matter, Hernandez forfeited this claim on appeal. A failure to object to testimony on hearsay or Confrontation Clause grounds forfeits that objection on appeal. (Evid. Code, § 353, subd. (a); *People v. Redd* (2010) 48 Cal.4th 691, 730 [Confrontation Clause]; *People v. Pannah* (2005) 35 Cal.4th 395, 476 [hearsay].) Further, a "failure to join in the objection or motion of a codefendant constitutes a waiver of the issue on appeal." (*People v. Wilson* (2008) 44 Cal.4th 758, 793.) Although Bonilla's counsel objected to Valdez's testimony about Bonilla's statement as hearsay, Hernandez's counsel did not raise any objection.

In any event, even if we assume the trial court erred when it admitted Bonilla's statement implicating Hernandez, we find such error was harmless. "'Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705].' [Citation.] [Under *Chapman*,] [w]e ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error. [Citation.]" (*People v. Loy* (2011) 52 Cal.4th 46, 69-70 (*Loy*).) The answer to this question is yes.

Even without reference to Bonilla's statement, the evidence established that Hernandez had ordered Bonilla to watch over the casita on the night of the victim's murder, and that he and Bonilla had communicated about the events transpiring at the casita immediately preceding the victim's murder. For example, Valdez testified that Hernandez introduced Bonilla as the person who would be providing security at the casita, and Valdez and Palacios both testified that, after they were introduced to him, Bonilla began watching over the casita's operations, including on the night the victim was murdered. Further, Hernandez's girlfriend told the police that Hernandez often used a cell phone registered in her name, and her phone records showed that, in the moments leading up to the victim's death, that phone exchanged several calls and text messages with a number registered to a prepaid cell phone, which was later connected to Bonilla.

28

Finally, the prosecution's gang expert testified that a gang member assigned to provide security inside a casita will often contact the gang member in charge of overseeing the extortion of, and drugs sales inside, the casita before assaulting or killing a rival gang member perceived as a threat to the controlling gang's interest in the casita.

Even without consideration of Bonilla's statement made to Valdez, the evidence compellingly showed that Hernandez and Bonilla were communicating about the events occurring at the casita immediately before the victim's death. Accordingly, we conclude exclusion of Bonilla's statement would not have weakened the evidence connecting Hernandez to the victim's murder. (*Loy*, *supra*, 52 Cal.4th at p. 71.) Any error in admitting Bonilla's statement made to Valdez was harmless beyond a reasonable doubt. (*Ibid*.)

## IV. The Trial Court Was Not Required To Instruct the Jury on Consent as a Defense To Burglary

Defendants next contend the trial court erred when it did not instruct the jury on consent as a defense to burglary. Defendants never requested a consent instruction; rather, they argue the trial court had a sua sponte duty to instruct on consent because the evidence established that Valdez and Palacios consented to defendants' entry into the casita for the purpose of selling drugs.

As already discussed, defendants' murder charges were premised on three theories, one of which was felony murder. In relying on the felony murder theory, the prosecution alleged the victim was murdered during defendants' uncharged burglary of the casita. A defendant is guilty of burglary if he enters a house, apartment, or business with the intent to commit a felony. (§ 459.) Lack of consent to enter a building is not an element of burglary. (*People v. Sherow* (2011) 196 Cal.App.4th 1296, 1304-1305.) Rather, consent is a defense to burglary, and a defendant asserting such defense bears the burden of raising a reasonable doubt as to the facts underlying the defense. (*Id*. at pp. 1304-1305, 1309.) To establish a consent defense, the defendant must show that the occupant of the subject building "(1) actively invited the defendant to enter with knowledge of the defendant's felonious intent, and (2) the defendant knew that the

29

occupant was aware of his felonious intent." (*Id.* at p. 1305; see also *People v. Felix* (1994) 23 Cal.App.4th 1385, 1397-1398 (*Felix*).)

As a preliminary matter, there was no indication that either Bonilla or Hernandez relied on consent as a defense to burglary at trial. (See *Maury*, *supra*, 30 Cal.4th at p. 425.) Neither of defendants' counsel requested the instruction or argued that consent was a defense to burglary. Nevertheless, defendants contend the trial court was required to instruct on consent because the prosecution's evidence supported such a defense and the defense was consistent with defendants' theories of the case. (See *ibid*.) We disagree.

A trial court has a sua sponte duty to instruct on a particular defense "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 424 (*Maury*).) That duty never arose in this case.

The prosecution's evidence established that defendants gained access to the casita through the use of fear and implied threats. Permission to enter a building obtained through duress, the use of fear, threats of force, or fraud does not constitute consent sufficient to defeat a charge of burglary. (*People v. Brock* (2006) 143 Cal.App.4th 1266, 1275-1276 (*Brock*) ["Force, fear and duress negate apparent consent."]; *People v. Sipult* (1965) 234 Cal.App.2d 862, 867 (*Sipult*) [apparent consent obtained through fraud is ineffective]; see also *People v. Waidla* (2000) 22 Cal.4th 690, 723 (*Waidla*) [evidence that defendant gained entry to the building by instilling fear in the victim was material to burglary because it was material to the element of entry]; *Felix*, *supra*, 23 Cal.App.4th at p. 1398 [consent must be express and clear].)

Insufficient evidence supports defendants' theory that they obtained clear, express, and effective consent to enter the casita for the purposes of providing protection for Valdez's and Palacios's casita. (See *Maury*, *supra*, 30 Cal.4th at p. 424.) Hernandez initiated contact with Valdez and Palacios. After doing so, he used direct and implied threats of harm to arrange the payment agreement through which he was to receive a portion of the casita's revenue and gain physical access to the casita for him and Bonilla.

30

For example, soon after Valdez and Palacios opened the casita, Hernandez called Valdez's phone from outside the casita demanding to speak with Valdez in person and threatening to break down the casita's doors if she did not meet with him. When Valdez confronted Hernandez by herself, he was with a group of men. During this conversation, he implied that those who worked at and frequented the casita were at risk of being killed by local "cholos" if Valdez and Palacios did not agree to pay him a portion of the casita's revenues. In addition, during his conversation with Palacios, Hernandez said he hoped they could reach an agreement because he did not want any trouble, implying that any refusal by Valdez or Palacios to pay Hernandez would be met with violence.

At trial, both Valdez and Palacios testified that they were scared of Hernandez. Their fear stemmed from the fact that they had never met or heard of Hernandez before he threatened to break down the casita's door, and because he had implied that they would be the victims of gang violence if they did not cooperate with his demands. No evidence was introduced suggesting that Valdez first approached Hernandez about arranging a payment agreement for the casita's protection.

Additionally, the evidence does not support a theory that Valdez and Palacios freely, clearly, and effectively consented to defendants' entry into the casita as part of a mutual drug-sales agreement. Hernandez first raised the issue of drug sales, when he asked Valdez whether she and Palacios sold drugs inside the casita. Valdez told Hernandez that they neither sold, nor intended to sell, drugs there. When Hernandez told Valdez and Palacios that he would sell drugs inside the casita and, as a compromise, reduce the amount of payments he demanded from them, Valdez and Palacios were too afraid to refuse his offer. This fear stemmed from Hernandez's earlier threats and implications that, if Valdez and Palacios refused to enter into a payment agreement with Hernandez, they would be met with violence. No other evidence was introduced indicating that Valdez and Palacios freely consented to Hernandez's request to sell drugs inside the casita. As a result, there was insufficient evidence to trigger the trial court's duty to instruct on consent based on Valdez's and Palacios's agreement to allow Hernandez to sell drugs in the casita. (See *Maury*, *supra*, 30 Cal.4th at p. 424; see also

31

*Brock*, *supra*, 143 Cal.App.4th at p. 1275; *Felix*, *supra*, 23 Cal.App.4th at p. 1398 [consent must be express and clear].)

Defendants rely on *People v. Superior Court* (*Granillo*) (1988) 205 Cal.App.3d 1478 to argue that sufficient evidence established that Valdez and Palacios consented to their entry into the casita for the purposes of selling drugs so as to trigger the trial court's duty to instruct the jury on consent. This reliance is misplaced.

In *Granillo*, the Court of Appeal affirmed the trial court's section 995 dismissal of seven counts of burglary premised on the defendant's entry into an undercover police officer's apartment with the intent to sell stolen property. (*Granillo*, *supra*, 205 Cal.App.3d at p. 1480.) In dismissing the burglary charges, the trial court found the defendant had obtained informed and knowing consent from the undercover police officer to enter the apartment with the intent to sell stolen property. (*Id*. at p. 1486.)

The trial court's finding was based on the following facts: As part of a sting operation, the Visalia Police Department assigned an undercover officer to live in an apartment from within which he was supposed to purchase stolen property. (*Granillo*, *supra*, 205 Cal.App.3d at p. 1480.) The undercover officer and other members of the police department let it be known throughout the community that the officer was living in the apartment, and that he was interested in buying stolen property. (*Ibid*.) The officer also offered kickbacks to people who referred others to sell stolen property to him. (*Id*. at p. 1481.) When the defendant learned that the undercover officer wanted to purchase stolen property, he called the officer and offered to sell numerous stolen items. (*Ibid*.) The officer told the defendant that he was interested in purchasing the items and asked the defendant to come to his apartment. (*Ibid*.) At the apartment, the defendant offered to sell the stolen items to the officer. (*Ibid*.) The defendant and the officer met at the apartment for the same purpose on six subsequent occasions. (*Ibid*.)

The court in *Granillo* held that the trial court properly dismissed the defendant's burglary charges because the undercover officer knew of the defendant's felonious intent and invited the defendant to enter his apartment for purposes related to that intent, and, in turn, the defendant knew the officer was aware of his felonious purpose and was

32

interested in buying stolen property from the defendant. (*Granillo*, *supra*, 205 Cal.App.3d at pp. 1485-1486.) The court also observed that the defendant's entries into the officer's apartment could not be classified as an intrusion upon the officer's possessory interest or as a fundamentally deceitful act because the officer had intended to set the burglaries in motion. (*Id*. at p. 1486, citing *People v. Collins* (1986) 42 Cal.3d 378, 395.)

The instant case is materially distinguishable from *Granillo*. Although Valdez and Palacios advertised their casita, they did not actively seek out individuals that would be interested in selling drugs inside the casita or, as discussed above, freely consent to defendants' entry into the casita for the purpose of selling drugs. Indeed, Valdez and Palacios did not want drugs inside the casita; however, they agreed to allow Hernandez and his associates to sell drugs because they (Valdez and Palacios) could not otherwise afford to pay Hernandez and were afraid he would harm them if they did not agree to pay him.

Defendants next contend their convictions for attempted extortion necessarily demonstrate that sufficient evidence supported their consent defenses because consent is an element of extortion. (See § 518.) This argument is misguided.

First, defendants' convictions for attempted extortion does not necessarily establish that Valdez and Palacios consented to defendants' entry into the casita on the night of the murder. Consent is not an element of attempted extortion. (See § 524.) In any event, the type of consent that supports a conviction for extortion is different from that which supports a defense to burglary; consent for the purposes of extortion must be obtained through the "wrongful use of force or fear." (§ 518; see also *People v. Torres* (1995) 33 Cal.App.4th 37, 50 [in the crime of extortion, property is taken with the victim's "consent," which is obtained through force or fear].) As discussed immediately above, consent obtained through force or fear is insufficient to support a consent-based defense to burglary. (See *Brock*, *supra*, 143 Cal.App.4th at p. 1275; *Sipult*, *supra*, 234 Cal.App.2d at p. 867; *Waidla*, *supra*, 22 Cal.4th at p. 723; *Felix*, *supra*, 23 Cal.App.4th at p. 1398 [consent must be express and clear].) Therefore, the jury's finding that

33

defendants committed attempted extortion does not establish sufficient evidence that Valdez and Palacios consented to defendants' entry into the casita so as to trigger the trial court's duty to instruct on consent as a defense to burglary.

In light of the foregoing, we conclude insufficient evidence supported a consent-based defense to the uncharged burglary allegation underlying defendants' felony murder charge. Accordingly, the trial court was not required to instruct the jury on consent. (See *Maury*, *supra*, 30 Cal.4th at p. 424.)

**V.     The Trial Court's Error in Not Instructing the Jury on Accomplice Testimony Was Harmless**

Defendants next contend the trial court erred when it did not instruct the jury sua sponte on accomplice testimony pursuant to section 1111. Defendants argue there was sufficient evidence from which the jury could have concluded Valdez and Palacios were accomplices to the victim's murder. Defendants argue that, based on this evidence, the trial court should have instructed the jury as follows: (1) it was required to determine whether Valdez and Palacios were accomplices; and (2), if it did make such a determination, that it was required to view Valdez's and Palacios's testimony with caution and not rely on such testimony unless corroborated by independent evidence.

Valdez and Palacios testified as two of the prosecution's primary witnesses. Valdez and Palacios operated the casita at which the victim was murdered, and they were the subjects of defendants' extortion scheme. Valdez and Palacios also agreed to allow Hernandez to sell drugs inside the casita. Additionally, Valdez and Palacios were at the casita on the night the victim was murdered, and Valdez witnessed Bonilla's conduct immediately leading up to and through the time he killed the victim. Defendants argue Valdez and Palacios were subject to prosecution for the victim's murder under a natural and probable consequences theory, and, as a result, qualified as accomplices for purposes of section 1111.

Section 1111 provides in pertinent part: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not

34

sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.) "'[W]hen there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the law of accomplices,' including the need for corroboration. [Citation.]" (*People v. Tobias* (2001) 25 Cal.4th 327, 331 (*Tobias*).)

An accomplice is defined as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) "[T]o be an accomplice, the witness must be chargeable with the crime as a principal . . . and not merely as an accessory after the fact . . . . [Citation.]" (*People v. Felton* (2004) 122 Cal.App.4th 260, 268.) "It is not sufficient if the person simply gives assistance with knowledge of the perpetrator's criminal purpose. Merely giving assistance without sharing the perpetrator's purpose and intent establishes liability only as an accessory, not as an accomplice. [Citations.]" (*People v. Snyder* (2003) 112 Cal.App.4th 1200, 1220 (*Snyder*).)

""[W]henever the testimony given upon the trial is sufficient to warrant the conclusion upon the part of the jury that a witness implicating a defendant was an accomplice,'" the trial court must instruct the jury sua sponte to determine whether the witness was an accomplice in the charged offense. [Citations.] By the same token, if the evidence adduced at trial establishes *as a matter of law* that a witness was an accomplice to the charged offense, the jury must be so instructed." (*Snyder*, *supra*, 112 Cal.App.4th at pp. 1218-1219.) "Conversely, where, as a matter of law, the witness is not an accomplice, the court does not err in refusing to charge that he is or in refusing to submit the issue to the jury." (*People v. Hoover* (1974) 12 Cal.3d 875, 880 (*Hoover*).) "[T]o establish that an individual is an accomplice, a defendant bears the burden of both producing evidence raising that issue and of proving the accomplice status by a preponderance of the evidence." (*People v. Belton* (1979) 23 Cal.3d 516, 523.)

If the trial court instructs on accomplice liability, and the jury determines that the subject witness is an accomplice, the jury may not rely on that witness's testimony unless the testimony is corroborated by independent evidence. (*People v. Szeto* (1981) 29

35

Cal.3d 20, 27 (*Szeto*).) It is then the prosecution's burden to "produce independent evidence which, without aid or assistance from the testimony of the accomplice, tends to connect the defendant with the crime charged." (*Ibid*.)

As a preliminary matter, we observe that Valdez and Palacios were the victims of defendants' extortion scheme. As a result, they could not be defined as accomplices under the attempted extortion charge or any of the murder charges based on defendants' attempted extortion or conspiracy to commit extortion. (See § 1111 [To qualify as an accomplice, the witness must be subject to prosecution for the same offense charged against the defendant]; see also *Tobias, supra,* 25 Cal.4th at p. 334 ["Because the [witness] . . . is a victim and cannot be prosecuted as an accomplice, accomplice instructions are not appropriate."].)

However, the trial court should have instructed the jury sua sponte on accomplice testimony because there was sufficient evidence from which the jury could have concluded that Valdez and Palacios were accomplices to the victim's murder under a natural and probable consequences theory, where offering to sell a controlled substance was the target offense. Valdez and Palacios agreed to allow Hernandez to sell drugs once he offered to lower the amount of "rent" he demanded in exchange for him having exclusive control over the casita's drug sales. Although Valdez and Palacios testified that they were scared of Hernandez, and that their fear influenced their decision to allow Hernandez to sell drugs, that sentiment alone does not establish that they could not have been subject to prosecution for aiding Hernandez in his sale of drugs inside the casita. Valdez and Palacios did not testify that Hernandez threatened immediate and imminent harm should his request to sell drugs be denied so as to give rise to a duress defense. (See *People v. Heath* (1989) 207 Cal.App.3d 892, 900 ["Duress is an effective defense only when the actor responds to an immediate and imminent danger."].) Further, there is no evidence in the record that Valdez's and Palacios's decision to allow Hernandez to sell drugs was the only course of action the couple could have taken to avoid any threats of harm they perceived Hernandez to have made. (See *Id*. at pp. 900-901 [to give rise to a necessity defense, "[t]he situation presented to the [actor] must be of an emergency

36

nature, threatening physical harm, and lacking an alternative, legal course of action"].) In fact, at trial, Valdez testified that she was not opposed to the idea of selling drugs at the casita. Accordingly, there was sufficient evidence from which the jury could have concluded that Valdez and Palacios intended to aid and abet Hernandez's drug-sales scheme. For example, the jury could have concluded that Valdez and Palacios believed they could have benefited financially from aiding Hernandez's drug sales through a potential increase in the number of patrons frequenting the casita and a decrease in the amount of rent they would have had to pay Hernandez to continue operating the casita.

Further, the jury could have concluded that a reasonable person in the position of Valdez or Palacios could have foreseen that the victim's shooting was a foreseeable result of Hernandez's drug-sales operation inside the casita. (See *Medina*, *supra*, 46 Cal.4th at p. 927 [liability under a natural and probable consequences theory is dependent on whether a reasonable person in the accomplice's position would have known that the charged offense was a reasonably foreseeable consequence of the act the accomplice aided and abetted].) Not long before she was first approached by Hernandez, Valdez had been warned by an individual at the bar where she advertised the casita that gang members would make her pay rent for operating the casita. Accordingly, the jury could have concluded that Valdez and Palacios had reason to know Hernandez and Bonilla were involved with a gang at the time they agreed to allow Hernandez to sell drugs inside the casita. As the prosecution's expert testified, gang-related violence, including murder, is a foreseeable result of gang activity being conducted inside a casita located in gang territory. In light of the foregoing, we conclude there was sufficient evidence to support the trial court instructing the jury sua sponte on accomplice testimony with respect to Valdez's and Palacios's statements made at trial.

Although the trial court should have instructed the jury on accomplice testimony pursuant to section 1111, we nevertheless conclude the court's failure to do was harmless. "A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record." (*People v. Gonzales*

(2011) 52 Cal.4th 254, 303 (*Gonzales*), citing *People v. Lewis* (2001) 26 Cal.4th 334, 370.)

For purposes of section 1111, corroborating evidence does not need to be sufficient on its own to convict the defendant of the offense for which the accomplice's testimony is offered to prove. (*Szeto*, *supra*, 29 Cal.3d at p. 27.) Additionally, the evidence does not need to corroborate every fact to which the accomplice testifies. (*Ibid.*) Rather, the evidence is sufficient if it tends to connect the defendant to the crime in a manner that enables the jury to reasonably determine the accomplice is telling the truth. (*Ibid.*) Put another way, "[c]orroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense . . . ." (*Gonzales*, *supra*, 52 Cal.4th at p. 303.)

Here, Valdez's and Palacios's statements made at trial were corroborated by independent evidence that connected defendants to the attempted extortion and murder charges. First, Valdez's sister testified that she answered a call on Valdez's phone from a man named Cesar, who told her that he was standing outside the casita and would break down the casita's doors if Valdez did not meet with him. Immediately after speaking to the man named Cesar, Valdez's sister called Valdez to tell her about the call. This evidence corroborated Valdez's testimony that she first met Hernandez outside the casita when he introduced himself as Cesar and demanded that she pay him a portion of the casita's proceeds in exchange for his protection. Valdez's sister's testimony also corroborated Palacios's testimony that after Valdez spoke to her sister, he watched Valdez meet a man outside the casita who he later identified as Hernandez.

Second, the victim's brother testified that immediately before the victim was murdered, he was on the phone with the victim. He also testified that while he was on the phone with the victim, he heard gunshots, looked outside his window, and saw a man he later identified as Bonilla running from the casita. This evidence corroborated Valdez's testimony that she saw Bonilla shoot the victim soon after the victim stepped outside the casita to speak on the phone.

Finally, the prosecution's witnesses testified to the cell phone exchanges linking Hernandez to the events immediately preceding the victim's murder. Hernandez's girlfriend testified that around the time of the victim's murder Hernandez was using a cell phone that was registered in her name. Verizon Wireless's custodian of records testified that, in the moments leading to the victim's murder, the same cell phone exchanged several calls and text messages with a number registered to a prepaid cell phone, which was later connected to Bonilla. This evidence corroborated Valdez's testimony that she saw Bonilla using his cell phone immediately before the victim's murder and that Bonilla had told her that he was sending Hernandez a text message moments before he killed the victim.

In light of the foregoing, we conclude sufficient independent evidence corroborated Valdez's and Palacios's statements made at trial and tied defendants to the charges of murder and attempted extortion. Accordingly, the trial court's error in failing to sua sponte instruct on accomplice testimony was harmless. (*Gonzales*, *supra*, 52 Cal.4th at p. 303; *People v. McKinzie* 54 Cal.4th 1302, 1353.)

## VI. Bonilla Was Not Prejudiced by His Trial Counsel's Conduct

Bonilla separately contends he received ineffective assistance of counsel. Bonilla argues his counsel rendered ineffective assistance by failing to request a jury instruction addressing consent as a defense to burglary, and by failing to argue that defense to the jury. Bonilla further argues his trial counsel rendered ineffective assistance by failing to request a jury instruction addressing accomplice testimony. Because we conclude Bonilla was not prejudiced by any of his counsel's omissions, we reject his claims for ineffective assistance of counsel.

"The benchmark for judging any claim of ineffective assistance of counsel must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington* (1984) 446 U.S. 668, 686 (*Strickland*).) To establish a claim for ineffective assistance of counsel, the defendant must satisfy two requirements. (See *id.* at pp. 690-692.) First, the defendant must show his attorney's conduct was "outside the wide range

39

of professionally competent assistance." (*Id.* at p. 690.) Second, the defendant must demonstrate there is a reasonable probability that but for his attorney's conduct, the result of the proceeding would have been different. (*Id.* at p. 694.) We are not confined to analyzing a claim of ineffective assistance of counsel in any particular order; if it is easier to dispose of an ineffective assistance of counsel claim on the ground that the defendant was not prejudiced by his counsel's conduct, we may proceed on that ground first. (*Id.* at p. 697.)

### A. Counsel's Failure To Request the Consent Instruction and Argue Consent as a Defense To Burglary

Bonilla has not established that he was prejudiced by his counsel's failure to request an instruction defining consent as a defense to burglary and to argue such defense to the jury. As discussed above, there was insufficient evidence to establish that Valdez and Palacios consented to defendants' entry into the casita so as to support a consent-based defense to burglary. As a result, the trial court could have properly denied the instruction had Bonilla's counsel requested it. (*People v. Bohana* (2000) 84 Cal.App.4th 360, 370 ["The trial court has no duty to instruct on a defense that is not supported by substantial evidence."].)

Further, counsel's failure to argue consent as a defense to burglary did not prejudice Bonilla. Overwhelming evidence supported Bonilla's conviction for murder as the direct perpetrator under a malice aforethought theory. Further, no evidence was introduced from which the jury could conclude that someone other than Bonilla killed the victim. As a result, it is not reasonably likely the jury would have reached a more favorable verdict had Bonilla's counsel argued a consent-based defense to the prosecution's felony murder theory. (See *Strickland*, *supra*, 466 U.S. at p. 697.)

A conviction for first degree murder is proper under a malice aforethought theory if the defendant "'killed "as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on cooly and steadily, . . . according to a *preconceived design*." [Citation.]'" (*People v. Anderson* (1968) 70 Cal.2d 15, 26, original italics.) Courts typically look to the following types of evidence in determining

whether the defendant acted with premeditation and deliberation: (1) whether the defendant engaged in planning activity prior to the killing; (2) whether the defendant had a motive to kill the victim; and (3) whether the defendant killed the victim in such a manner as to show the killing was intentional and according to a preconceived design. (*Id.* at pp. 26-27.)  These factors are not required to be present in any specific combination, and courts are not required to accord them any specific weight.  (*People v. Pride* (1992) 3 Cal.4th 195, 247.)

Here, it is not reasonably probable that the jury would have reached a more favorable verdict because overwhelming evidence supports Bonilla's conviction under a malice aforethought theory.  Valdez witnessed the events leading up to, and through, the victim's murder.  She saw the victim claim that he was a member of 18th Street and reveal his tattoo of the number "18."  She saw Bonilla angrily watch the victim from the time the victim claimed membership in 18th Street through the time he left the apartment. When Valdez asked Bonilla to calm down as he watched the victim, he refused and told her that he "was a person who wouldn't put up with much, . . . that he didn't care what could happen."  When the victim stepped outside the casita to talk on the phone, Valdez saw Bonilla follow him out.  Valdez continued to watch Bonilla as he walked up to the victim, punched the victim in the head, and shot the victim to death.

Valdez's testimony that Bonilla was the shooter was corroborated by other evidence.  The victim's brother testified that he heard gunshots while he was on the phone with the victim and looked outside to see Bonilla running away from the casita. Additionally, the police found a phone clip outside the casita's door, near the location of the shooting, that contained DNA consistent with a DNA sample obtained from Bonilla.

This evidence established that Bonilla acted with premeditation and deliberation. Bonilla watched the victim the entire time he claimed membership in Bonilla's rival gang.  Additionally, while he was watching the victim, Bonilla told Valdez that he would not put up with much and that he did not care about "what could happen," suggesting that he was planning to attack the victim.  Bonilla also had a motive to kill.  While inside the casita, the victim claimed membership in Bonilla's rival gang.  (See *People v. Williams*

41

(1997) 16 Cal.4th 153, 194 [evidence of defendant's gang membership and the victim's apparent membership in the defendant's rival gang was highly relevant to the issue of motive].) Finally, Bonilla killed the victim in a manner demonstrating that the killing was intentional and executed according to a preconceived design. After watching the victim claim membership in 18th Street, Bonilla waited for the victim to step outside the casita. Bonilla then followed the victim outside, punched him in the head, and repeatedly shot him as he tried to run away. In light of this overwhelming evidence establishing Bonilla's guilt under a direct malice aforethought theory, it is not reasonably likely the jury would have reached a more favorable verdict had Bonilla's counsel requested an instruction on consent and argued a consent-based defense to the prosecution's felony murder theory. (See *Strickland*, *supra*, 466 U.S. at p. 697.)

### B. Counsel's Failure To Request the Accomplice Testimony Instruction

Bonilla also has not established that he was prejudiced by his counsel's failure to request an accomplice testimony instruction. Although we have concluded that there was sufficient evidence to support an accomplice testimony instruction with respect to Valdez's and Palacios's testimony, as discussed above, sufficient independent evidence corroborated Valdez's and Palacios's statements connecting Bonilla to the murder and attempted extortion charges. As a result, Bonilla's counsel's failure to request an accomplice testimony instruction was harmless because there is no reasonable probability the jury would have reached a different verdict had the instruction been requested and provided to the jury. (See *Gonzales*, *supra*, 52 Cal.4th at p. 303 [failure to instruct on accomplice testimony is harmless if there is sufficient evidence corroborating the witness's testimony]; see also *Strickland*, *supra*, 466 U.S. at p. 697.)

### VII. Cumulative Error

Defendants next argue that even if the trial court's instructional errors are harmless when viewed in isolation, the cumulative effect of such errors warrants reversal of defendants' murder convictions. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to

42

defendant in their absence.' [Citation.] When the cumulative effect of errors deprives the defendant of a fair trial and due process, reversal is required." (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)

It is not reasonably probable the jury would have reached a more favorable result in the absence of the trial court's instructional errors. As discussed, sufficient evidence corroborated Valdez's testimony linking defendants to the murder and attempted extortion charges.

With respect to Hernandez, sufficient evidence supports his conviction for murder under a felony murder theory, a valid theory independent of the natural and probable consequences doctrine. (See *Chiu, supra,* 59 Cal.4th at p. 166.) Further, the court's error in instructing on the natural and probable consequences doctrine did not affect the jury's perception of the evidence supporting Hernandez's conviction for murder under a felony murder theory. Accordingly, the cumulative effect of the court's errors in instructing on the natural and probable consequences doctrine and failing to instruct on accomplice testimony did not prejudice Hernandez.

With respect to Bonilla, the prosecution did not rely on the erroneous natural and probable consequences instruction in pursuing his conviction for first degree murder. Further, as discussed, there was overwhelming evidence that he was the individual that shot and killed the victim, thereby establishing his liability as the direct perpetrator under a malice aforethought theory. Accordingly, we find Bonilla was not prejudiced by the cumulative effect of the trial court's instructional errors.

## VIII. Defendants' Challenge To the Trial Court's Victim Restitution Order

At the sentencing hearing, defendants stipulated that the amount they owed in victim restitution was $7,680. The trial court then stated that it would "enter that order," but it did not specify whether defendants were jointly and severally liable for the $7,680 in victim restitution. The court's minute orders from the sentencing hearing pertaining to

43

Bonilla[12] and defendants' abstracts of judgment also do not specify whether defendants are jointly and severally liable for victim restitution.

Defendants contend that, in the event their convictions are not reversed, their abstracts of judgment should be amended to reflect that each defendant's liability for the $7,680 in victim restitution is joint and several.  The People agree, and so do we. Although the court did not state that defendants are jointly and severally liable for victim restitution, it had the authority to do so.  (*People v. Neely* (2009) 176 Cal.App.4th 787, 800 (*Neely*).)  In light of defendants' stipulation that the total amount owed in victim restitution was $7,680, and the court's acceptance of that stipulation, the record reflects that the court intended to order defendants to be jointly and severally liable for victim restitution.  (See *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535; see also *Neely*, *supra*, 176 Cal.App.4th at p. 800.)  Accordingly, we order modification of the trial court's judgment to expressly provide that the restitution order is joint and several as to Bonilla and Hernandez.

## DISPOSITION

The trial court's judgments against Bonilla and Hernandez are modified to expressly provide that defendants are jointly and severally liable for direct victim restitution.  In all other respects, the judgments are affirmed.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**                                    **ZELON, J.**

---

[12]    The record contains duplicates of the sentencing minute orders for Bonilla but does not contain any sentencing minute orders for Hernandez.

44